After an ore tenus proceeding, the Morgan Circuit Court entered a judgment divorcing Melinda Lilly Brasili, the wife, and Sean Anthony Brasili, the husband, on the basis of the husband's adulterous conduct. The divorce judgment contained a property division awarding the wife, among other things, $30,000 from the husband's deferred-compensation account,[1] a van (as to the indebtedness on which the wife was *Page 815 
directed to make monthly payments beginning July 2001 in the amount of $299.51), and an award of rehabilitative alimony. With respect to the alimony, the trial court ordered that from November 2000 through June 2001, the husband was to pay the wife rehabilitative alimony in the amount of $200 per month and was to retain health insurance on the wife (thought to cost $290 a month); commencing July 2001 and continuing thereafter for 36 months, the husband was ordered to pay the wife rehabilitative alimony in the amount of $1,500 per month.[2] The husband was awarded, among other things, the marital home, which at the time of the divorce had been for sale for two months and which was encumbered by two mortgages totaling approximately $142,288.71.[3] The husband was required to pay $14,760.78 of marital debt.[4] The wife was granted custody of the parties' three minor children, and the husband was ordered to pay child support of $1,526 per month in accordance with the child-support guidelines set forth in Rule 32 of the Alabama Rules of Judicial Administration.
At trial (in November 2000), the husband was 32 years of age, and the wife was 29 years of age. The parties met in Mobile during the wife's senior year at the University of South Alabama. The parties married on August 21, 1993, after the wife had graduated, and they lived initially in Augusta, Georgia. At the time of the parties' marriage, the husband was employed by Nycomed Amersham Imaging ("Nycomed Amersham"), a medical-contrast media company, as a salesman. Although the wife held a college degree in leisure services, tourism, and commercial recreation, she worked only briefly during the marriage (approximately one year) as a salesclerk earning $7 to $8 per hour. At some point between 1996 and 1998, the parties moved to Decatur. Three children were born of the marriage: a daughter born in 1995; a son born in 1997; and another daughter born in February 1999.
The parties separated in January 2000. At that time, the husband moved into an apartment in Madison; in June 2000, he moved to Michigan after accepting a promotion to area sales director. The wife and the children remained in the marital home until July 2000, at which time they moved into the wife's mother's house in Florence. During the pendency of the divorce, the husband, realizing continued employment in Michigan would result in his spending less time with the children, decided to move closer to where the children lived. The husband accepted a job with Boston Scientific, a medical-supply company, as a catheter salesman, and he was to begin that job the week following the trial in this case. That job was to be based in Nashville, Tennessee, and the husband was planning to live at his parents' *Page 816 
home until he could afford to move into an apartment. The husband's sales territory extended south to Florence, and his work schedule would enable him to spend one afternoon each week with the children and to have the children visit him every other weekend in Nashville. When asked about the move at the trial, the wife expressed approval.
The husband's gross wages for the years he worked as a salesman with Nycomed Amersham were as follows: 1993-$45,364.34; 1994-$54,838.13; 1995-$48,958.56; 1996-$48,596.47; 1997-$53,373.38; 1998-$73,520.75; and 1999-$69,067.97. When the husband was promoted to area sales director, he received an $8,000 annual raise, resulting in an annual salary of $76,000. It was anticipated, but not guaranteed, that he would receive approximately $15,000 in annual bonuses in that job; in fact, he received $18,000 in bonuses in 2000.
The husband's compensation with Boston Scientific was to be as follows: during the month of November 2000, the husband would receive $3,538.48 (which included base pay in the amount of $1,538.48 plus a training bonus in the amount of $2,000); during the month of December 2000, the husband would receive $6,615.38 (which included base pay in the amount of $4,615.40 plus a training bonus in the amount of $2,000); beginning January 2001, the husband would receive $1,538.46 every two weeks in gross income, plus monthly commissions. He testified that he expected to earn monthly commissions in the amount of $3,000 to $3,500 per month, for a total annual salary of approximately $80,000 to $82,000. Therefore, the husband's gross income would amount to approximately $6,833 per month, and the husband estimated he would have a net monthly income of approximately $4,200.
Both parties offered testimony regarding their monthly living expenses. The husband testified that his monthly living expenses totaled $1,726.71 (without consideration of the mortgage payments[5] and marital debt). His monthly budget consisted of the following: apartment rent in the amount of $800; renter's insurance in the amount of $40; company car expenses in the amount of $150; utilities (electric, gas, water, trash, cable, telephone) totaling $210; groceries in the amount of $320; medical insurance (covering himself and the children) in the amount of $106.71; and visitation expenses (travel and food) in the amount of $100. His monthly budget did not include any amount for clothing, either for himself or the children; gifts for the children; haircuts; dry cleaning; recreation; or medical co-payments.
The wife testified that her monthly living expenses totaled $3,060. Her monthly budget consisted of the following: a house payment in the amount of $800; a car payment in the amount of $300; groceries in the amount of $500; gasoline in the amount of $80; insurance expense in the amount of $76; utilities (telephone, cable, and other utilities) totaling $257; cellular telephone expense in the amount of $25; church contributions in the amount of $40; *Page 817 
church school expenses for the children in the amount of $290; school lunches for the children in the amount of $60; activities for the children in the amount of $105; clothing expenses for herself and the children in the amount of $300; haircuts and other miscellaneous expenses (including car and house maintenance, etc.) in the amount of $100; and entertainment expense (including general entertainment, vacation, birthdays, and Christmas) in the amount of $127.
The wife testified that she was not aware of any jobs in the Florence area related to her collegiate course of study. Although the wife testified that she looked at the job advertisements in the newspaper each day, she admitted that she had not "actively" sought employment. The wife testified that she desired to return to school to obtain a teaching certificate, and she testified that in her opinion a career as a teacher would mesh nicely with her duties as a single mother. The wife testified that she intended to begin college in the fall of 2001, and that it would take her approximately two and one-half years to earn a teaching certificate.
The husband testified that he began contributing to an employer-matched retirement account with Nycomed Amersham in January 1993 and that he had continued to do so during the parties' marriage. Income tax on the contributions to that account was deferred pursuant to26 U.S.C. § 401(k) (the account is one designated as a "401(k) account"). The husband testified that he contributed 8% of his income to the 401(k) account and that the employer's contribution rate changed over time, but that it had averaged approximately 4% of his income. At the time of trial, the husband estimated the 401(k) account to be worth approximately $72,000.
The husband testified that the 401(k) plan administrator permitted hardship withdrawals, but that such withdrawals were subject to a penalty prohibiting contributions for one year. The husband testified that he could borrow money from the 401(k) account and stated that he had borrowed $6,000 in the past to pay off some of the parties' debt; the 401(k) loan had been paid in full at the time of trial. After examining the proposed budgets of both parties, the husband testified that he would prefer to take out an installment note in lieu of borrowing additional funds from the 401(k) account. He further testified that any withdrawals from the 401(k) account, before its maturity, would be subject to tax penalties.
At the conclusion of the trial, the trial judge indicated that he would render a judgment divorcing the parties on the ground of adultery. The trial court subsequently divorced the parties on the ground of adultery "as alleged and proved." The judgment stated that the basis for the divorce was "[t]he [husband's] adultery as alleged in the complaint filed herein and as was shown by the evidence." The husband filed a postjudgment motion to vacate the judgment; that motion was denied by the trial court.
On appeal, the husband contends that the trial court erred in awarding the wife $30,000 out of his 401(k) account because, he says, under §30-2-51(b)(1), Ala. Code 1975, the trial court had no authority to make such an award in light of the fact that the parties had not been married for 10 years. The husband also argues that the trial court erred in determining the amount of the rehabilitative-alimony award; specifically, he argues that the amount he was ordered to pay as rehabilitative alimony beginning July 2001 ($1,500 per month) will financially cripple him. Finally, the husband argues that the trial court erred by granting the divorce on the ground of the husband's adulterous conduct *Page 818 
because, he says, the wife did not allege that ground in her complaint or move for leave to amend the pleadings in open court; he claims that he was not allowed the opportunity to assert the affirmative defense of condonation.
We begin by noting the appropriate standard of review in divorce proceedings. "Trial judges enjoy broad discretion in divorce cases, and their decisions are to be overturned on appeal only when they are `unsupported by the evidence or [are] otherwise palpably wrong.'" Exparte Bland, 796 So.2d 340, 344 (Ala. 2000) (quoting Ex parte Jackson,567 So.2d 867, 868 (Ala. 1990)). Where the question on appeal is purely a question of law, the ore tenus rule does not apply, and appellate review is de novo. Keevan v. Keevan, 796 So.2d 379 (Ala.Civ.App. 2001).
We first address the issue whether the trial court erred in awarding the wife $30,000 out of the husband's 401(k) account. The husband argues that § 30-2-51(b) prohibits a trial court from awarding a spouse any portion of a covered spouse's 401(k) account unless the specific conditions set out in § 30-2-51(b) are met. The wife argues that a trial court can divide a 401(k) account and award a noncovered spouse a portion of the covered spouse's account because, she says, a 401(k) account does not fall within the meaning of "retirement benefits" under § 30-2-51(b).
In 1995, the Alabama Legislature amended § 30-2-51 to add subsections (b) and (c). Act No. 95-549, Ala. Acts 1995, § 1. Subsection (b) of § 30-2-51 provides how "retirement benefits" are to be treated for purposes of dividing property pursuant to a divorce:
 "The judge, at his or her discretion, may include in the estate of either spouse the present value of any future or current retirement benefits, that a spouse may have a vested interest in or may be receiving on the date the action for divorce is filed, provided that the following conditions are met:
 "(1) The parties have been married for a period of 10 years during which the retirement was being accumulated.
 "(2) The court shall not include in the estate the value of any retirement benefits acquired prior to the marriage including any interest or appreciation of the benefits.
 "(3) The total amount of the retirement benefits payable to the noncovered spouse shall not exceed 50 percent of the retirement benefits that may be considered by the court."[6] *Page 819 
In this case, the parties are asking us to construe § 30-2-51(b) and, specifically, the term "retirement benefits" under that statutory provision.
 "`"The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute. Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect."'
 "Swift v. Gregory, 786 So.2d 1097 (Ala. 2000), quoting IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala. 1992)."
Carroll v. Ward, 814 So.2d 287, 290 (Ala.Civ.App. 2001).
The language of § 30-2-51(b) is plain and unambiguous. Section30-2-51(b), by using the phrase "provided that the following conditions are met," sets forth an exclusive list of conditions that must be met for a trial court to exercise discretion to include retirement benefits in the estate of a covered spouse for purposes of a property division in a divorce case. Our construction of § 30-2-51(b) is consistent with the legislative intent, as stated in the preamble to the Act,[7] and with previous decisions of this court.
In Walker v. Walker, 695 So.2d 58, 60-61 (Ala.Civ.App. 1997), Retired Appellate Judge Wright stated:
 "In 1995 our legislature amended § 30-2-51, Ala. Code 1975, effective January 1, 1996, to address the division of a spouse's retirement benefits. . . .
 "Pursuant to § 30-2-51(b), a trial court has discretionary authority, if the conditions of § 30-2-51(b)(1), (2), and (3) are met, to include the present value of any current or future retirement benefits that a spouse has a vested interest in or is receiving."
(First emphasis added; second emphasis in original.)
In Piatt v. Piatt, 736 So.2d 632, 632 (Ala.Civ.App. 1999), this court, in reversing a trial court's award to one spouse of a portion of the covered spouse's retirement benefits where the conditions of §30-2-51(b) were not met, held: "The statute [§ 30-2-51(b)] prohibits
the court from including in the estate the value of benefits acquired prior to the marriage." (Emphasis added.)
In Mayhann v. Mayhann, 820 So.2d 836 (Ala.Civ.App. 2001), this court further commented on § 30-2-51(b)(1) in a footnote:
 "The husband's retirement accounts were not subject to inclusion in his separate estate for purposes of fashioning an allowance to the wife because the parties had not been married for at least 10 years. See Ala. Code 1975, § 30-2-51(b)(1)."
820 So.2d 838 n. 1 (emphasis added).
We now turn to the wife's contention that a 401(k) account does not fall within the meaning of "retirement benefits" under § 30-2-51(b). In order to ascertain and give effect to what the Legislature *Page 820 
intended the phrase "retirement benefits" to mean in enacting the 1995 amendment, the words "retirement benefits" "must be given their natural, plain, ordinary and commonly understood meaning." Carroll, supra;Robicheaux v. Robicheaux, 731 So.2d 1222, 1223 (Ala.Civ.App. 1998).
A review of Alabama caselaw regarding how retirement benefits in divorce cases were treated before § 30-2-51(b) was enacted confirms what we consider to be the plain and ordinary meaning of the phrase "retirement benefits" under § 30-2-51(b). In Kabaci v. Kabaci,373 So.2d 1144, 1146 (Ala.Civ.App. 1979), this court held that military "retirement benefits" could not be distributed as a marital asset in a divorce case. In Ex parte Vaughn, 634 So.2d 533 (Ala. 1993), our Supreme Court overruled Kabaci and held that military "retirement benefits" could be considered a marital asset and thus could be divided as marital property in a divorce. 643 So.2d at 536-37.
After Kabaci was decided, but before Ex parte Vaughn, this court had specifically determined that a 401(k) account was a "retirement benefit." In Nelson v. Nelson, 611 So.2d 1113 (Ala.Civ.App. 1992), this court reversed a trial court's award to the wife of one-half of her husband's 401(k) plan. The evidence in that case established that "one-half of the approximately $93,000 in this plan was contributed by the husband through payroll deductions, and that one-half of the amount in the plan was contributed by the husband's employer." Nelson, 611 So.2d at 1115. This court, in relying on Kabaci, reversed the trial court's judgment and stated: "It is well settled under Alabama law that retirement benefits are not divisible for the purposes of a property settlement or an award of alimony in gross." Nelson, 611 So.2d at 1115.
In Grigsby v. Grigsby, 620 So.2d 35 (Ala.Civ.App. 1993), this court upheld a trial court's judgment that did not award the wife any portion of her husband's 401(k) account. In Grigsby, this court stated:
 "The wife contends that the 401(k) plan is not a retirement plan and that it should be divisible as marital property. There is no dispute that the stock purchase plan is a qualified plan under I.R.S. Code § 401(k). Therefore, while the initial entry into the plan is voluntary, any withdrawal or distribution therefrom is limited to separation from employment, death, or disability, or the attainment of a certain age. The testimony reflects that the husband's only retirement plan is this employer-sponsored stock purchase plan. It is well settled in Alabama that retirement benefits are not divisible for the purpose of a property settlement or an award of alimony in gross. Cole v. Cole, 538 So.2d 21 (Ala.Civ.App. 1987): Kabaci v. Kabaci, 373 So.2d 1144 (Ala.Civ.App. 1979). Therefore, we must hold that the trial court's refusal to treat the 401(k) plan as divisible property was not error. Nelson v. Nelson, 611 So.2d 1113
(Ala.Civ.App. 1992)."
620 So.2d at 36.
Because Nelson and Grigsby were decided after Kabaci, but before Exparte Vaughn, their determination that a 401(k) plan falls within the ordinary meaning of a "retirement benefit" is particularly instructive in this case. Kabaci stood for the principle of law that "retirement benefits" could not be considered a part of the marital estate. 373 So.2d at 1146. Applying Kabaci, this court determined in Nelson and Grigsby
that 401(k) plans were "retirement benefits" and were not subject to division in divorce cases. Nelson, *Page 821 
611 So.2d at 1115; Grigsby, 620 So.2d at 36.[8]
After the issuance of the opinion in Ex parte Vaughn and after the enactment of § 30-2-51(b), and consistent with Nelson and Grigsby, this court has referred to 401(k) plans as "retirement benefits," thereby further indicating that the plain and ordinary meaning of "retirement benefits" includes 401(k) plans. In Kennedy v. Kennedy, 743 So.2d 487,488 (Ala.Civ.App. 1999), this court noted that the trial court had "awarded each party any 401(k) or other retirement benefits in their respective names." (Emphasis added.) In Ex parte Yost, 775 So.2d 794,795 (Ala. 2000), the Supreme Court also referred to a 401(k) plan as a retirement benefit, noting that the trial court had awarded "each party any 401(k) plan or other retirement benefits in their separate names."
In James v. James, 764 So.2d 549 (Ala.Civ.App.), rev'd on othergrounds, 764 So.2d 557 (Ala. 1999), this court held that an individual retirement account is a type of retirement benefit that falls under § 30-2-51(b). In James, this court reversed a trial court's award to the wife of a portion of her husband's individual retirement account where the husband's entire balance in that retirement account had been accumulated before the marriage. Id. at 553. We conclude that a 401(k) account, like an individual retirement account, is a "retirement benefit" for purposes of § 30-2-51(b).
Although a 401(k) plan falls within the meaning of "retirement benefits" under § 30-2-51(b)(1), the parties in this case were not married for 10 years during which the covered spouse's retirement benefits were being accumulated; therefore, pursuant to § 30-2-51(b), the husband's 401(k) account is not subject to division. See Mayhann,supra. We reverse the judgment of the trial court as to that issue.[9]
The husband next contends that the trial court erred in awarding the wife $1,500 per month for 36 months as rehabilitative alimony because, he says, that amount will leave him financially crippled. The husband argues that when the husband's undisputed living expenses, the financial obligations imposed upon the husband by the trial court, the husband's income, the short duration of the marriage, the wife's education, and the ages of the parties are taken into consideration, the trial court's judgment as to rehabilitative alimony amounts to an abuse of discretion.[10] Because we reverse the judgment as to the property-division issue, we also reverse the *Page 822 
judgment as to the rehabilitative-alimony issue, so that the trial court will, on remand, have before it all matters concerning payments between the parties. See Ex parte Bland, 796 So.2d at 345 (wherein the Supreme Court held that this court's reversal of a trial court's judgment awarding the wife 25% of the husband's military-retirement benefits was proper in light of this court's remand for a determination of periodic alimony, so that in fashioning a new judgment, the trial court would have before it all matters concerning payments between the parties); see alsoWilling v. Willing, 655 So.2d 1064 (Ala.Civ.App. 1994) (noting that matters of alimony and property division are interrelated). Factors that the trial court should consider in its award of alimony and its division of property on remand include the earnings abilities of the parties; the future prospects of the parties; their ages and health; the duration of the marriage; the parties' stations in life; the marital properties and their sources, values, and types; and the conduct of the parties in relation to the divorce. Willing, 655 So.2d at 1067.
Finally, the husband argues the trial court erred by granting the divorce on the grounds of the husband's adulterous conduct because, he says, the wife did not allege that ground in her complaint or seek to amend the pleadings in open court. He contends that he was prejudiced because he was not allowed the opportunity to offer evidence of condonation by the wife. See generally § 30-2-3, Ala. Code 1975.[11]
We note that the husband does not argue that the trial court abused its discretion in making a property division or awarding alimony based on his admitted adulterous affair, nor that the trial court's decision to base the divorce on the ground of adultery had any other adverse impact on the husband insofar as other provisions of the judgment are concerned. The husband contends only that the judgment should be reversed so that it may be revised to state that the divorce was based upon an "irretrievable breakdown" of the marriage.[12] The husband concedes that he was not surprised that testimony regarding his adulterous affair was presented at trial; he merely argues that he would have introduced evidence of condonation if he had known that the divorce was going to be granted on that ground. The wife contends that the trial court did not err in granting the divorce based on the husband's adulterous conduct; alternatively, she contends that if reliance upon that ground was error, it was harmless.
Rule 15(b), Ala.R.Civ.P., provides in pertinent part, as follows: *Page 823 
 "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits."
(Emphasis added.) The husband argues that although Rule 15(b), Ala.R.Civ.P., provides for liberal amendment of pleadings to conform to the evidence, see, e.g., International Rehabilitation Associates v.Adams, 613 So.2d 1207 (Ala. 1992), and Jones v. LeFlore, 421 So.2d 1287
(Ala.Civ.App. 1982), an amendment should not be allowed if the opposing party will be "unduly prejudiced" by the amendment; he cites Thorne v.Thorne, 344 So.2d 165 (Ala.Civ.App. 1977), in support of that position.Thorne is distinguishable from this case in that the trial court inThorne prejudiced the mother by injecting the issue of custody modification (without notice in the pleadings) into a case that had originally involved only a father's petition to enforce his rights of visitation. See Thorne, 344 So.2d at 171.
In this case, the husband was not unduly prejudiced by the trial court's consideration of his adulterous conduct as a ground for the divorce. The husband concedes that he was not surprised that testimony regarding his adulterous affair was presented at the trial; moreover, the husband admitted to adultery in his deposition testimony and at trial, and he allowed additional testimony about the adulterous affair without objection. Also, the trial judge stated in open court that he would grant the divorce on the ground of the husband's adultery, yet no objection was made at that time.
We conclude that the husband's claim that he was prejudiced in connection with the trial court's finding that the parties should be divorced based upon the husband's adultery is without merit.
For the foregoing reasons, the judgment of the trial court is due to be affirmed in part and reversed in part, and the cause remanded for the trial court to reconsider the property division and the alimony award.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
Yates, P.J., and Crawley, Thompson, and Pittman, JJ., concur.
[1] The divorce judgment stated:
 "12. The [wife] shall be and she is hereby entitled to receive a portion of the [husband's] 401(k) account equal to $30,000 in value and the [husband] shall forthwith prepare and submit to the Court an appropriate Qualified Domestic Relations Order whereby the [wife's] portion of the said 401(k) account hereby awarded shall be effectuated."
A "qualified domestic relations order" ("QDRO") may be used to effectuate a property division of one spouse's retirement account pursuant to a divorce. See Employee Retirement Income Security Act of 1974,29 U.S.C. § 1056(d)(3)(D)(I), and the Internal Revenue Code,26 U.S.C. § 414(p)(1)(A) (defining the term "QDRO").
[2] The trial court set the amount of rehabilitative alimony at $200 per month for six months in order to give the husband an opportunity to sell the marital home before he was required to pay $1,500 rehabilitative alimony for 36 months.
[3] The marital home was encumbered by a first mortgage in the amount of $113,455.69 and by a second mortgage in the amount of $28,833.02. The monthly payment on the first mortgage was $862.44, and the monthly payment on the second mortgage was $438.90.
The husband testified that the parties had paid $122,500 for the marital home, that the parties had added $28,833 worth of improvements to the marital home, and that he hoped to sell the home for $155,000 to $157,000.
[4] The marital debt included the following: credit-card bills in the amount of $10,471.24; unsecured miscellaneous debts in the amount of $416.55; medical bills for the children in the amount of $2,999.55; and medical bills for the parties in the amount of $873.44.
[5] As previously stated, the marital home was encumbered with two mortgages in the approximate amount of $142,288.71 and had been on the market for two months at the time of the trial. The husband testified that had he remained employed by his former employer, that employer would have purchased the marital home for $157,000 if it did not sell. He also testified that if his former employer purchased the marital home and then he left that employer within three years he would have to reimburse the employer for his transfer costs. The husband testified that he did not believe it was ethical for him to cause his former employer to buy the house and then to leave the company shortly afterwards.
[6] Before subsection (b) was added to § 30-2-51, questions regarding how a spouse's retirement benefits were to be treated for purposes of a property division in a divorce were analyzed under what are now § 30-2-51(a) and § 30-2-52. Subsection (a) of § 30-2-51
provides:
 "If either spouse has no separate estate or if it is insufficient for the maintenance of a spouse, the judge, upon granting a divorce, at his or her discretion, may order to a spouse an allowance out of the estate of the other spouse, taking into consideration the value thereof and the condition of the spouse's family. Notwithstanding the foregoing, the judge may not take into consideration any property acquired prior to the marriage of the parties or by inheritance or gift unless the judge finds from the evidence that the property, or income produced by the property, has been used regularly for the common benefit of the parties during their marriage."
Section 30-2-52 provides:
 "If the divorce is in favor of either spouse for the misconduct of the other spouse, the judge trying the case shall have the right to make an allowance to either spouse out of the estate of either spouse, or not make an allowance as the circumstances of the case may justify, and if an allowance is made, the misconduct of either spouse may be considered in determining the amount; provided, however, that any property acquired prior to the marriage of the parties or by inheritance or gift may not be considered in determining the amount."
[7] The Act's preamble states that its purpose is "to provide for discretionary inclusion of certain retirement benefits within a spousal estate when the court determines an allowance upon the grant of a divorce if certain conditions are met."
[8] Although Kabaci dealt with military-retirement benefits, this court, applying Kabaci, determined that the following types of retirement accounts were "retirement benefits" and not subject to division in divorce cases: state civil-service plan, see Rowe v. Rowe, 601 So.2d 1048
(Ala.Civ.App. 1992); private retirement plans, including individual retirement accounts, Keogh accounts, and annuities, see Shelton v.Shelton, 595 So.2d 900 (Ala.Civ.App. 1992); qualified pension plan, seeCole v. Cole, 538 So.2d 21 (Ala.Civ.App. 1987); profit-sharing retirement plan, see Bradford v. Bradford, 607 So.2d 286 (Ala.Civ.App. 1992).
[9] We note that although the husband's 401(k) plan is not subject to division under § 30-2-51(b), it may be used by the trial court as a source of income to pay periodic alimony. See Ex parte Bland, 796 So.2d at 345; Shelton v. Shelton, 595 So.2d 900 (Ala.Civ.App. 1992) (retirement benefits can be considered as a source of income upon which a periodic alimony award may be based).
We also note that the husband conceded at trial that the 401(k) account could be taken into consideration in determining his separate estate and his ability to pay alimony.
[10] Although the husband argues that the trial court erred in granting the divorce on the grounds of adultery, he does not argue that the trial court erred by considering fault in awarding alimony.
[11] In Zinnerman v. Zinnerman, 803 So.2d 569, 575 (Ala.Civ.App. 2001), this court stated:
 "`"Condonation means the willing continuance of cohabitation, a living together in the same place from which sexual intercourse may in general be presumed."' Rush v. Rush, 551 So.2d 1075, 1076 (Ala.Civ.App. 1989), quoting Latham v. Latham, 54 Ala. App. 305, 307, 307 So.2d 703, 707 (Ala.Civ.App. 1975). `Condonation' in the context of a divorce case means forgiveness by the offended spouse. Id. Where there has been a condonation of adultery, a divorce may not be granted on the ground of adultery. Id. Something more than a temporary cohabitive relationship must occur in order to support a finding of condonation in a divorce proceeding. Id."
[12] In her complaint the wife alleged as grounds for divorce
 "that there exists between [the wife] and [the husband] a real, substantial, and genuine compatibility [sic] of temperament and that there has arisen therefrom an irretrievable breakdown of the parties' marital union and that any further attempts at reconciliation would prove to be futile, and impracticable, and unavailing."
In the husband's answer, he counterclaimed for a divorce, alleging the same grounds as the wife.